CHAUNCEY v. The MARY BELLE ROBERTS. See Case No. 13,240.

CHEEK, The. See Cases Nos. 7,002–7,005.

CHEEK (WAGGENER v.). See Case No. 17,035.

CHEESEBROUGH (NEAFIE v.). See Case No. 10,064.

CHEESEBROUGH, The A. See Case No. 25.

CHEESEMAN (FEARING v.). See Case No. 4,710.

## Case No. 2,633.

The CHEESEMAN et al. v. TWO FERRY-BOATS.

[2 Bond, 363.] [1]

District Court, S. D. Ohio. Oct. Term, 1870.

JURISDICTION OF DISTRICT COURT—OHIO RIVER—REGULATION OF "COMMERCE AMONG THE STATES"—STEAM FERRY-BOATS—SALVAGE—COMPENSATION.

1. The district court of the United States for the southern district of Ohio, as a court of admiralty, has territorial jurisdiction in case of a seizure on the Ohio side of the Ohio river, at high-water mark.

2. The court also has admiralty jurisdiction over the Ohio, as a navigable river, by virtue of section 9 of the judiciary act of 1789, as construed by the supreme court of the United States.

3. Ferry-boats propelled by steam, and used as such between two cities in different states, are within the scope of congressional legislation, under the grant of power to regulate commerce "among the states," and are subject to the jurisdiction of the national courts in the exercise of their admiralty powers.

[Cited in Murray v. Ferry-Boat, 2 Fed. 90; The St. Louis, 48 Fed. 313.]

4. Ferry-boats, or any other property of value, adrift on the Ohio river and in peril, are the subjects of a salvage service.

[Cited in Salvor Wrecking Co. v. Sectional Dock Co., Case No. 12,273; Maltby v. Steam Derrick-Boat, Id. 9,000; The Old Natchez, 9 Fed. 477. Approved in same case, Id. 479.]

5. To constitute a good salvage service, it is enough to show that the property rescued was exposed to danger greater than is incurred in ordinary navigation, and it need not be proved that the danger was imminent or immediate.

6. The claim that the property was in possession of prior salvors is not sustained, if it appear that their efforts to save it had not been and would not be successful.

7. Those in possession are estopped from claiming as salvors, if they requested the aid of those who interposed and saved the property.

8. Where the facts in a case show a legal salvage service by the libellants, but not of the highest order of merit, they are not entitled to a high rate of compensation.

---

[1] [Reported by Lewis H. Bond, Esq., and here reprinted by permission.]

In admiralty.

Lincoln, Smith & Warnock, for libellants.
D. T. Wright, for claimant.

OPINION OF THE COURT. This is a libel in rem, in behalf of the steamboat J. W. Cheeseman and owners, to recover a salvage compensation for assistance and relief to two ferry-boats and their floats, alleged to have been in a condition of peril on the Ohio river. The libel contains the usual averments, and need not be recited at length. An answer has been filed by Samuel Wiggins, the owner of the ferry-boats and their appendages, in which he denies, in substance, that any salvage service has been rendered by the libellants, and insists, if such service was rendered, it is not a case within the admiralty jurisdiction of this court, and that no decree can therefore be rendered for compensation.

There is no controversy as to the material facts in the case, except as to one point, which will be noticed in the progress of this opinion. These facts, as alleged in the libel, and substantially sustained by the evidence, may be briefly stated as follows: These ferry-boats, with the floats attached, were lying at a wharf or landing on the Ohio side of the river, a short distance above the city of Cincinnati, in charge of a watchman placed on them by the owner. They had been built as ferry-boats to run between Cincinnati and the city of Covington, Ky., on the opposite side of the river. They were of the largest class of ferry-boats, intended to be propelled by steam power, and were well and strongly built. The engines and other necessary equipments were in position, and the boats were ready for service, but had not been in actual use. Their value is estimated at from $25,000 to $30,000. The Ohio river at the time was at a high stage, then being more than forty feet in the channel, and was rapidly rising. At an early hour in the morning, the ferry-boats, with their attachments, being lashed together, were loosed from the wharf or dock to which they were fastened by some object coming in violent collision with them from above. With the watchman and another person on board, they drifted out into the stream, and were rapidly carried down by the force of the current. There was an anchor on board of considerable weight and strength, which was thrown out shortly after the boats reached the current of the river, with the hope of stopping them in their descent, which broke and wholly failed of its purpose. As the boats progressed, several persons at different points, in the whole some eight or nine, came off from the shore in skiffs to aid in stopping and landing them. Some four or five different attempts were made for this purpose, by carrying out lines or hawsers and making them fast to stumps or trees on the shore, all of which were unsuccessful. In some instances the lines broke from

the great strain upon them; in others they slipped over the stumps to which they were fastened, and in one the stump or tree was pulled out of the ground. As the boats were floating swiftly down the stream—at a point just above Taylorsville, some sixteen miles below Cincinnati—the steamboat J. W. Cheeseman, a boat duly licensed and enrolled under the laws of the United States, was coming up with a heavy and valuable cargo, destined for Cincinnati and places above. The master of the steamer, seeing the ferry-boats adrift not far from the Kentucky shore, hailed the persons on board, and inquired if they needed aid in stopping and landing them. To this inquiry there was an affirmative reply, and the proper order was given for rendering this aid. The first attempt was to get the steamer between the ferry-boats and the shore, with the purpose of pulling them to the shore. This attempt failed, and the steamer then changed her position so as to come in contact with the ferry-boats from the outside, and push them in. After drifting down some three miles, the steamer was successful in landing and securing the boats. One of the ferry-boats had lost its rudder in its descent by striking against the shore, and this was the only injury sustained by them. The ferry-boats, with their machinery, were of great weight, and were rendered the more unwieldy from the quantity of drift which had accumulated under and around them. The Cheeseman was occupied in the service about three hours, and in the opinion of some of the witnesses, was exposed to some danger of injury from her interposition. Being heavily laden, and not having sufficient power of engine to tow the boats to Cincinnati, they were left in charge of persons placed on board by the master of the Cheeseman, with a view, as stated, of coming down the next day and towing them to the city. In the meantime the owner of the ferry-boats employed another steamer to take them up, and this service was not therefore performed by the libellants. Soon after the ferry-boats were brought up, and while lying at a wharf on the Ohio side, a little distance above Cincinnati, they were attached by process from this court in this suit. On this state of facts, it is insisted by the proctor for the respondent: 1. That this court, as a court of admiralty, has no jurisdiction. 2. That upon the merits, the libellants are not entitled to a decree as for a salvage service.

1. The jurisdiction of the court is challenged mainly on the ground that these ferry-boats, when seized in this suit, were lying at the shore on the Ohio side of the river, and not therefore within the territorial limits and jurisdiction of this court. This point has been urged at great length in the argument, and requires the notice of the court. It is insisted in its support that the district court of the United States for the southern district of Ohio can not take cognizance in admiralty of

any case occurring on the Ohio river, for the reason that there is no express legislation by congress which authorizes it. The first and most obvious reply to this objection is, that these boats when seized were at the Ohio shore, when the Ohio river was at a high stage of water, and were clearly therefore within the state of Ohio and within the territorial limits of this district. The act of congress of February 10, 1855, dividing the state of Ohio into two judicial districts, after fixing the line separating the northern and southern districts, provides that all that part of the state lying south of that line shall compose one district, to be called the southern district of Ohio. There can be no doubt, therefore, that the boundary of this district on the south is the same as that fixed by the old constitution of the state of Ohio, which declares that the state shall be bounded "on the south by the Ohio river to the mouth of the Great Miami river." And this was regarded as in accordance with the deed of cession by the state of Virginia of March 1, 1784, of all the territory lying "northwest of the Ohio river."

It is not necessary, nor is it intended, to discuss the question whether from the terms used in the deed of cession, and the constitution of Ohio, the boundary of the state on the south extends to low-water mark in the Ohio river, or to a medium line between high and low-water mark. The state of Ohio has heretofore claimed, and will doubtless continue to claim, the latter as her true southern boundary. It is certain she will never concede to the states of Kentucky and Virginia the extension of their boundaries to the high-water line on the Ohio side. In this view the want of jurisdiction in this case, on the ground stated, has no basis on which it can rest, for the reason that these ferry-boats, when arrested, were within the jurisdictional limits of this district. This must be viewed as a conclusive answer to the argument against the jurisdiction of this court in this case. Since the decision of the case of The Genesee Chief, in 1851, 12 How. [53 U. S.] 443, there is no room for a doubt that the district courts of the United States have admiralty cognizance of all cases arising on the navigable rivers of the West. The supreme court, in that case, settled the doctrine—unalterably as I trust—that this jurisdiction does not depend on the ebb and flow of the tide, but on the navigability of the river. And they base this claim of jurisdiction on section 9 of the judiciary act of 1789 (1 Stat. 83), which provides that the district courts "shall have exclusive cognizance of all civil causes of admiralty and maritime jurisdiction, including all seizures under the laws of imposts, navigation, or trade of the United States, where the seizure is made on waters which are navigable from the sea by vessels of ten or more tons burden, within their respective districts, as well as upon the high seas." Remarking on this provision, the court say: "The jurisdic-

tion is here made to depend on the navigable character of the water, and not on the ebb and flow of the tide. If the water was navigable, it was deemed to be public; and, if public, was regarded as within the legitimate scope of the admiralty jurisdiction."

It may be remarked here, that since the decision in the case of The Genesee Chief, this court, without doubt or scruple, has taken cognizance of admiralty suits occurring on the western rivers, when the boats proceeded against were brought within its jurisdiction and seized by its process. And among these cases there have been many in which damages were claimed for collisions, and some founded on claims for salvage services. The same course has been pursued, it is believed, by all the admiralty courts in the West. Several of the cases in which jurisdiction has thus been taken by the western courts have been appealed to the supreme court, and adjudicated there without a question of the rightfulness of its exercise. [Fretz v. Bull] 12 How. [53 U. S.] 466; [Walsh v. Rogers] 13 How. [54 U. S.] 283; [The New World v. King] 16 How. [57 U. S.] 469; [Ure v. Coffman] 19 How. [60 U. S.] 56; [New York & V. Co. v. Calderwood] Id. 245.

I will briefly refer to some other cases, in which the question of admiralty jurisdiction on the western waters was involved, and has been distinctly decided by the supreme court. The case of The Magnolia, 20 How. [61 U. S.] 296, was a suit for a collision on the Alabama river, above tide-water, and within the body of a county. The court say, in their opinion, in reference to the act of 1789: "If the flux and reflux of the tide be abandoned as an arbitrary and false test of a navigable river, it required no further legislation of congress to extend it to the Mississippi, Alabama, and other great rivers, navigable from the sea. If the waters over which this jurisdiction is claimed, be within this category, the act makes no distinction between them."

The ruling of the supreme court, in [Commercial Trans. Co. v. Fitzhugh] 1 Black [66 U. S.] 576, is clear and explicit on this question of jurisdiction. The suit was for a collision on the Hudson river, within the territorial limits of the northern district of New York, but the seizure was made in the southern district. The case was taken by appeal from the decree of the circuit court for the latter district to the supreme court. Exceptions were there urged to the jurisdiction of the lower courts: First, because it did not appear that the colliding boats were engaged in foreign commerce, or commerce between two states; second, because the collision took place within the body of a county; and third, because, if the case was properly cognizable in admiralty, the jurisdiction pertained to the northern district of New York. These exceptions were distinctly overruled by the supreme court as unsustainable on principle or authority. In their opinion the court say: "When the district courts

were organized, they were authorized by congress to exercise exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction, including all seizures under laws of imposts, navigation, or trade of the United States, where the seizures are made on waters which are navigable from the sea by vessels of ten or more tons burden, within their respective districts, as well as upon the high seas. That provision of the judiciary act remains in full force, and unrestricted, as applied to the navigable waters of the Hudson, and all the other navigable waters of the Atlantic coast, which empty into the sea, or the gulfs and bays that form a part of the sea. All such waters are in truth but arms of the sea, and are as much within the admiralty and maritime jurisdiction as the sea itself." And again, the court say: "If it appears, as in cases of collision, depredation on property, etc., that it was committed on navigable waters within the admiralty and maritime jurisdiction of the United States, the case is one properly cognizable in admiralty." The court, after distinctly setting aside the objection that the collision took place within the body of a county, also hold that the jurisdiction of the district court for the southern district of New York is not affected by the fact that the collision occurred within the northern district. And the doctrine is strongly asserted as to marine torts, that they may be sued for, either "in personam, in any district where the offending party resides, or in rem, wherever the offending thing is found within the jurisdiction of the court issuing the process." The source and extent of the jurisdiction of the district courts being thus clearly defined, this court has no hesitancy in taking cognizance of the case now before it. True, the claim in this suit is for a salvage service; and in the cases referred to, the suits were for collisions, sounding in tort. But there can be no question, that where the proceeding is in rem for salvage, the principles settled by the supreme court apply with the same force as in torts. Torts are said to be local in contradistinction to cases of maritime jurisdiction arising ex contractu; but they are only local in the sense that they must have been committed on the sea, or on some navigable water within the pale of admiralty cognizance. This fact being established, any district court within which the thing proceeded against is found and seized, has rightful jurisdiction. It follows, necessarily, that claims for salvage services may be prosecuted in the admiralty under the grant of admiralty jurisdiction as conferred by the act of 1789, as construed by the supreme court. The right to enforce such claims in the maritime courts dates back to the origin of such courts, and was unquestionably within the contemplation of the act just referred to.

The sole inquiry as a test of jurisdiction in this case seems, therefore, to be: Was the

service, for which compensation is sought in this action, performed on a navigable stream? And this question does not admit of a doubt. The Ohio river, in fact, as well as by judicial decision, is a navigable river. There is no force in the argument urged in opposition to this conclusion, that there are portions of the season when, from low water or ice, it can not be navigated. The supreme court, in the case of Nelson v. Leland, 22 How. [63 U. S.] 48, have decided, that the temporary interruption of the navigation of a river does not destroy its character as a navigable stream. The court say in that case: "Many of our leading rivers are sometimes unnavigable, but this can not affect their navigability at other times." And in the case of the Wheeling Bridge, 13 How. [54 U. S.] 561, the court, in their opinion, say: "That the Ohio river is navigable, is a historical fact which all courts may recognize."

2. But it is urged as a further objection to the jurisdiction of the court in this case, that these ferry-boats, not being intended for use in carrying on commerce and navigation, are not subject to the commercial power of the general government, and not, therefore, subject to the maritime law, or within the range of its protection. It is insisted that, on this ground, a court of admiralty can not take cognizance of a claim for a salvage service rendered to them, and that a claimant for compensation for such service must be remitted to the laws of the state within which the service was rendered for his indemnity. The decision of this point is not perhaps material, as the jurisdiction of the court is sustainable on another and a broader ground, to which I shall presently advert. But I am by no means ready to concede the point insisted on in the argument. On the contrary, I incline to the opinion that these ferry-boats, when in use as such, are within the legitimate range of congressional legislation under the constitutional grant of power to regulate commerce "among the several states," and therefore within the scope of the admiralty jurisdiction of the national courts. They are costly in their construction and equipment, are propelled by steam, and designed for the transit of persons and property across a navigable river, which constitutes a boundary between two states. Why are they not within the control of congress, and subject to such commercial regulations as they may prescribe, to be exercised, of course, so as not to interfere with, or detract from, the right of the states to regulate the ferries within their limits? This question is answered by the fact that congress have exercised such a power in the laws passed requiring all vessels or boats propelled by steam, and to be used for the conveyance of passengers, to be inspected and licensed. It can not be questioned, that a steam ferry-boat, carrying thousands of persons daily, is within both the letter and the spirit of these acts of congress. But without intending to discuss this question, I will refer very briefly to the celebrated case of Gibbons v. Ogden, 9 Wheat. [22 U. S.] 1, as sustaining the conclusion indicated. I can not quote the whole of the luminous argument of Chief Justice 'Marshal in that case, nor will I do him the injustice of attempting to state an outine of the process by which he reaches his conclusions. His definition of commerce, as used in the constitution, is nearly equivalent to a demonstration. He says: "Commerce undoubtedly is traffic—but it is something more, it is intercourse." Is it not clear, that if a ferry-boat is used in carrying on both traffic and intercourse between states, it is fairly within the scope of such congressional legislation as does not conflict with the admitted rights of the states?

But it is further objected in this case, that there can be no decree in favor of the libellants for a salvage service, for the reason that the maritime law recognizes no service as a subject of admiralty cognizance, unless rendered to a boat or vessel, or the cargo of a boat or vessel, in peril of loss or destruction. The claim in the argument is, that no other property afloat on a navigable stream, however great its value or imminent its peril, can be the subject of a salvage service, in the sense of entitling the salvors to compensation by the decree of a court of admiralty. This question has not been directly passed upon by the supreme court, for the reason, probably, that such an objection has never before been made in any case in which it could have been urged. There are several cases which substantially involve this principle, and which, by fair inference, settle the question. I refer to those cases instituted in the district courts for injuries by steamboats on western rivers, by collisions with flat-boats and their cargoes, which have been taken by appeals to the supreme court. In none of these cases is there a doubt intimated, that they were properly cases of admiralty cognizance. The case of Fretz v. Bull, 12 How. [53 U. S.] 466, is one of the cases referred to. It was a suit for damages against the owners of a steamboat for running into and sinking a flat-boat on the Mississippi, laden with a valuable cargo. The cases of Culbertson v. Shaw, 18 How. [59 U. S.] 585, and Nelson v. Leland, 22 How. [63 U. S.] 48, are of the same character.

If, in collision cases, jurisdiction in admiralty can be maintained, when the injury is not to a vessel or the cargo of a vessel, it results inevitably that it may be maintained for a salvage service in saving property not within either of those categories. The principle involved is the same in both of these classes; but as a matter of policy and expediency there is a stronger reason for upholding this jurisdiction in suits for salvage than for collisions. In most cases, the common law courts of the states are competent to give a

full remedy for injuries by collision, but in salvage services they can only award compensation on the ground of quantum meruit, and can not regard those elements of a salvage service which it is the peculiar province of admiralty to consider, and which enter largely into the estimate of the allowance to be made.

Some references have been made in the argument to several writers of distinguished reputation, whose definitions of a salvage service restrict it to a service rendered to a vessel or the cargo of a vessel. It is not strange that English and American authors, with reference to the doctrine that admiralty jurisdiction was limited to the ebb and flow of the tide, should have stated the law of salvage in this restricted sense. Upon that theory such services would necessarily be rendered on the sea, or rivers within the ebb and flow of the tide, where it could rarely happen that the property saved was not either a vessel or its cargo. But since, in this country, this test of admiralty jurisdiction has been repudiated, it would seem necessarily to result that a salvage claim may be enforced in any case where valuable property in peril is saved on a navigable river, over which maritime jurisdiction extends. The American decisions fully sustain this view. In the case of The Emulous [Case No. 4,480], decided by Judge Story in 1832, nearly twenty years before the decision of the supreme court in the case of The Genesee Chief [supra], he does not limit a salvage service to a vessel or cargo, but expressly says, it extends to all property saved "on the sea or wrecked on the coast of the sea." The learned judge, in the light of the decision of the supreme court before referred to, would doubtless have added to his definition the words, or on any navigable river. In the case of The Emblem [Case No. 4,434], decided by the learned Judge Ware, in 1840, there is no intimation that a salvage claim is to be understood in the restricted sense contended for. In that case, salvage was awarded for saving the trunks of a passenger, containing a quantity of silver coin. The coin in the passenger's trunk was certainly no part of the cargo of the vessel, but it was property, and as such a proper subject of a salvage service. The judge says: "A person who preserves goods which are lost, or in danger of being lost by the fortunes of the sea, is entitled to a reward for that service." To the same effect is the doctrine as stated by Judge Curtis, late of the supreme court of the United States, in the case of Hennessey v. The Versailles [Id. 6,365]. That distinguished judge says: "The relief of property from an impending peril of the sea, by the voluntary exertions of those who are under no legal obligation to render assistance and the consequent ultimate safety of the property, constitutes a technical case of salvage." And Judge Marvin, in his late treatise on Wrecks and Salvage, gives the following definition: "Salvage is a com-

pensation for maritime services rendered in saving property, or rescuing it from impending peril on the sea, or wrecked on the coast of a sea, or on a public navigable river or lake, where inter-state or foreign commerce is carried on." See, also, Abb. Adm. 293 [Raft of Spars, Case No. 11,528]; 1 Spr. 323 [Taber v. Jenny, Case No. 13,720].

This view of the law of salvage, as applicable to western rivers, must be adopted. The protection of the vast commerce on those waters requires it. It is well known that every year property of the value of millions is afloat on these channels of trade, in flatboats, barges, and other craft, not required to be enrolled or licensed, and which in no proper sense can be designated as ships or vessels. And there is no reason why the rights of salvors rendering meritorious services in saving such property from injury or destruction, should not be recognized and enforced in admiralty. Upon any other principle the interests of western commerce will suffer material injury. It is not to be expected that prompt and effective salvage services will be rendered without the expectation of such liberal compensation as a court of admiralty alone can award. The laws of the states, so far as they relate to property adrift which is of small value, are sufficient to meet the cases for which they are intended. But as to property of value, they make no provision for indemnity for the time, labor, and hazard required in its rescue when in peril. This service, in general, can be only effectively rendered by steamboats employed in their regular trips, and navigated at a heavy daily expense; and it is idle to suppose that owners or masters will lend their aid in saving property in danger of destruction, if they are to be turned over to the drift laws of the states for compensation, or are obliged to resort to the local courts for that purpose.

The only inquiry which remains is, whether upon the facts before the court there is evidence of a legal salvage service which will sustain the libellants' claim. Their right to a decree on the merits is denied on two grounds: 1. That the ferry-boats, at the time the alleged salvage service was rendered, were in the possession of prior salvors, having the means to save them without the aid of the steamboat. 2. That the ferry-boats were not in such peril as to render the service of the steamboat a salvage service.

1. It is clear from the evidence, that neither the persons on board when these boats were first adrift, nor those who afterward came aboard before the interposition of the steamboat, were salvors in any proper sense of the term. It is of the essence of a legal salvage service that it should have been successful in saving the property. The proof in this case is entirely satisfactory, that after repeated trials by the persons on the ferry-boats, with all the means in their power,

they wholly failed to land the boats or materially to check their progress. Nor do the facts justify the conclusion that any subsequent efforts would have proved more successful. But on this point there is a fact proved which is conclusive. The master of the Cheeseman, when approaching the ferry-boats, inquired of those on board, if they needed his assistance in stopping and landing them, and in reply was informed that such aid was needed. This was a distinct admission that those on the ferry-boats had not the ability to stop and land them, and also proves that the steamboat did not interpose against the wishes of those aboard the ferry-boats.

2. As to the peril of these boats. On this point, it is proper to remark that the law in relation to the degree of danger to which saved property is exposed, has been recently a good deal modified by writers and judicial decisions on the subject. It was formerly held that it was an essential element of a good salvage service that the property should be in immediate and imminent peril. It is laid down by a distinguished writer on maritime law in a recent work, that "if the peril encountered be something distinctly beyond ordinary danger, something which exposes the property to destruction unless extraordinary assistance be rendered, it is enough to found a claim for salvage." 2 Pars. Mar. Law, 611. And in the case of The Independence [Case No. 7,014] the court say: "To be in a condition to have a salvage service rendered, a vessel must be subject to something more than the ordinary peril of the sea." And the learned judge distinctly affirms that it is not necessary that the peril should be such that escape without aid is impossible, or nearly so. The same doctrine has been laid down by the English admiralty courts. 3 W. Rob. 68; 1 W. Rob. 174; 3 W. Rob. 138.

There can be no question that the dangers to which these ferry-boats were exposed, though perhaps not imminent or immediate, were beyond those ordinarily attendant on river navigation. From the high stage of water and the swiftness of the current, they were in continual peril of being thrown violently against the shore, and of striking against trees, stumps, and rocks, and by these means of suffering essential injury, if not total wreck. But it is not material to inquire into the degree of danger to which the ferry-boats were exposed. By the request for assistance made by those on board, the owner is estopped from denying that the boats were in peril. The law, as stated by Judge Parsons, is, "that if the assistance of the salvors is requested by and rendered to the persons in charge of another vessel, they can not plead that they are not bound to pay for the services rendered, on the ground that the vessel would have been saved if left in her former position." 2 Pars. Mar. Law, 612.

Having no doubt as to the law on the points indicated. I have now only to fix the amount of compensation to be awarded to the libellants. On principles of public policy, as also in justice to meritorious salvors, judges and courts, both in England and in this country, have evinced no disposition to measure the rewards for such services on a stinted scale. But there is no unbending rule applicable to every case; and between the highest and the lowest order of merit, there is a wide range for the discretion of the judge. The law on this subject is well stated by Judge Curtis, in the case of Hennessey v. The Versailles [Case No. 6,365]. He says: "The value of the property saved, the degree of peril from which it was delivered, the risk of the property, and especially of the persons of the salvors, the severity and duration of their labors, the promptness of their interposition, and the skill exhibited by them, are all to be considered." It is clear, from the facts in this case, that there are no elements in the service rendered by the libellants entitling it to the highest, or even a high rate of compensation. There was no peril of life to any of the parties, nor was there any severe or long-continued labor, or any unusual personal hardship. Nor is it certain that there was any immediate danger of great injury to, or destruction of the ferry-boats. The witnesses for the libellant, it is true, swear that the steamboat was put to great hazard in rendering this service. On this point there is conflict in the evidence adduced by the parties. The respondents' witnesses say that the steamboat was in no danger. The truth no doubt lies between these extremes. The steamboat undoubtedly encountered some risks beyond those of ordinary navigation, but with skillful management it is impossible to conclude that there was any serious danger. Yet there were some elements in the service which entitle it to a measure of compensation beyond that of a mere quantum meruit. The ferry-boats, as already stated, were of great value, and the steamboat and cargo are valued at $30,000. The boat was engaged in its business of carrying freight and passengers. The river was at a high stage, and the current consequently rapid. A detention for even a few hours was a great loss to the boat. The service necessarily required high steam, involving a more than usual strain on the boat and the machinery The ferry-boats, with their floats and the accumulation of drift under and around them, were unwieldy, and not easily moved or controlled. And it was only upon a second trial, that the steamboat succeeded in stopping and getting them ashore.

Upon the whole, it seems to the court that an award of twelve hundred dollars to the salvors will fully meet the justice of the case. A decree for that sum will be entered, to be apportioned among the owners and officers and crew of the steamboat, as the court, by a future order, shall direct.